2020 IL App (2d) 180111-U
No. 2-18-0111
Order filed September 2, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-745 |
| MARK MAJKA, | ) ) | Honorable Philip G. Montgomery, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*: Evidence was sufficient to prove beyond a reasonable doubt that defendant committed disorderly conduct by making a false request for an ambulance knowing that there was no reasonable ground for believing that assistance was needed; the jury could conclude that, after a 911 operator refused defendant's unreasonable request for transportation to a sleep study, defendant feigned chest pain in order to have an ambulance dispatched.

¶ 2   Following a jury trial in the circuit court of De Kalb County, defendant, Mark Majka, was found guilty of disorderly conduct (720 ILCS 5/26-1(a)(9) (West 2014)). Defendant argues on appeal that the State failed to prove his guilt beyond a reasonable doubt. We affirm.

¶ 3                     I. BACKGROUND

¶ 4    The charge of disorderly conduct was based on the allegation that defendant "knowingly transmitted to the De Kalb County Sheriff's Office a report that he was having chest pains and requested an ambulance knowing at the time of that transmission that there were no reasonable grounds to believe that the assistance was required."  At trial, Sergeant Mary Criscione, a 911 operator, testified that on October 22, 2015, at around 7:15 p.m., she received a call from defendant.  A recording of their conversation was entered into evidence and played for the jury. The conversation was as follows:

> "Criscione: 911 where's your emergency?
>
> Defendant: 300 West Navaho in Shabbona.
>
> Criscione: What's going on there?
>
> Defendant: I need to get to Kishwaukee Hospital.
>
> Criscione: Uh, what's wrong?
>
> Defendant: I don't have a car and I have a sleep study to get to tonight.  I can't sleep.
>
> Criscione: Oh.
>
> Defendant: I have an infectious disease and I—
>
> Criscione: Okay.  Sir, we can't transport you because you have a sleep study appointment.
>
> Defendant: Yeah, I need to get to the hospital.  I'm starting to get chest pains and I need to get to the hospital.
>
> Criscione: Okay, that's not what you initially said.  What you initially said was that you need to get to the hospital because you don't have a car and you have a sleep study—

Defendant: I need to get to the hospital. I have a sleep study tonight and I'm having an anxiety attack.

Criscione: Okay. Defendant: Because I don't have a car. So, can you send me an ambulance, please?

Criscione: No, that's not how that works, sir ***. You need to—

Defendant: Well, no—

Criscione: —find a friend to take you to the hospital.

Defendant: I don't have any friends or family here. I'm a disabled veteran. *** need to get to the hospital. I pay taxes here.

Criscione: That's not what it's all about. What's your last name?

Defendant: Majka. I got insurance.

Criscione: And your first name?

Defendant: Mark ***.

Criscione: Okay, what happens when there is someone really with a real emergency and they really need to get to the hospital because they're dying and you're doing it because you have a sleep study?

Defendant: Ma'am, are you going to send an ambulance?

Criscione: It'll be on its way sir." {Exhibit 1 (audio file)}

¶ 5    Three paramedics, including Matthew McClane, responded to the call. McClane testified that they arrived at defendant's address at approximately 7:22 p.m. Defendant was outside of the house and he walked toward the ambulance. He had a cane but did not use it. He also had goggles, a respirator, wrist and knee braces, surgical masks, a duffel bag, and a belt holding various electronic devices. Defendant did not appear to be in distress; he seemed to be in a hurry to get to

the hospital. Once defendant was in the ambulance, McClane spoke with him. McClane "probably finally honed [*sic*] in on the fact that we were called for chest pain." Defendant said that he wasn't having chest pain anymore. His only complaint was that he couldn't sleep. McClane asked defendant if he was having a medical emergency. Defendant said that he was not.

¶ 6    McClane testified that it "was pretty clear at that point that [defendant] just wanted us for a ride." The paramedics contacted the emergency room and consulted with a physician who told them not to bring defendant in. Defendant told the paramedics that he was a taxpayer and (in McClane's words) "had a right to use the ambulance whenever."

¶ 7    Daniel Nudera testified that on October 22, 2015, he was a De Kalb County sheriff's deputy. At approximately 7:42 p.m., he was dispatched to defendant's address. It took him a little over half an hour to get there. When he arrived, an ambulance was parked in front of the house. An individual was in the back of the ambulance. The individual advised Nudera that he needed to get to the hospital for an appointment the next morning. He also said that he was a taxpayer. Nudera placed the individual under arrest.

¶ 8    Defendant's personal physician, Marcel Hoffman, testified that he first examined defendant in July 2015. According to Hoffman, defendant visited him because "he had multiple medical problems including chronic back pain, neuropathy, shortness of breath symptoms, and PTSD [(posttraumatic stress disorder)]." Hoffman referred defendant to several specialists. Defendant visited Hoffman again in August 2015. Hoffman observed that defendant was exhibiting shortness of breath, a cough, and back pain. Defendant told Hoffman that the cough was associated with toxic mold. Hoffman wrote a letter for defendant stating that he had medical illnesses "requir[ing] him to never have his telephone and Internet services disconnected." After defendant visited Hoffman again, in November 2015, Hoffman wrote a letter for him stating that

he had "serious medical illnesses which may require him to contact emergency help." It was Hoffman's opinion that defendant did, in fact, suffer from serious illnesses.

¶ 9     Defendant testified that in 2002 he was in a motor vehicle accident that caused injuries to his head, neck, spine, wrists, shoulder, knee, and ankle. He also suffered from PTSD. Defendant moved to Shabbona in 2015. Before then he lived in Marengo for about 10 months in a rented townhouse that was contaminated with black mold. Defendant developed a cough and respiratory symptoms while living in Marengo. He also suffered from anxiety. He continued to have these problems after moving to Shabbona.

¶ 10     Defendant was scheduled for a sleep study on October 22, 2015. He had no way to get to the appointment and had also been forced to cancel several prior appointments because he lacked transportation. The lack of transportation, combined with the stress of living in an unfamiliar rural community, created a lot of anxiety. Defendant had a history of chest pain related to a blood clotting disorder and he was experiencing chest pain on the day of his sleep study appointment. The pain started between 9 a.m. and 10 a.m. Defendant called 911 because of chest pain and shortness of breath. When speaking with the 911 operator, he mentioned the sleep study first because he was trying to tell her the "story that was leading up" to his chest pains. When defendant knew that an ambulance was on its way, he felt relieved, but the physical symptoms did not go away. Defendant testified that he told the paramedics that he had been experiencing pain all day. McClane's testimony that defendant told him he had no chest pain was untrue.

¶ 11                                   II. ANALYSIS

¶ 12     Defendant argues that the evidence was insufficient to sustain his conviction of disorderly conduct. Defendant was charged with violating section 26-1(a)(9) of the Criminal Code of 2012 (720 ILCS 5/26-1(a)(9) (West 2014)), which provides, in pertinent part, as follows:

"(a) A person commits disorderly conduct when he or she knowingly:

* * *

(9) Transmits or causes to be transmitted in any manner to the police department or fire department of any municipality or fire protection district, or any privately owned and operated ambulance service, a false request for an ambulance, emergency medical technician-ambulance or emergency medical technician-paramedic knowing at the time there is no reasonable ground for believing that the assistance is required[.]"

¶ 13     A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). On a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and determining what inferences to draw, and a reviewing court ordinarily will not substitute its judgment on these matters for that of the trier of fact. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000). Furthermore, even when the defendant provides uncontradicted testimony, "the trier of fact is not obligated to accept all or any part of that testimony, but may assess the probabilities, the reasonableness of any defense offered and reject any or all of defendant's account in favor of the State's circumstantial evidence of guilt." *People v. Hendricks*, 253 Ill. App. 3d 79, 90 (1993).

¶ 14    There is no dispute that defendant transmitted or caused the transmission of a request for an ambulance.  Defendant argues, however, that the evidence shows neither that he knowingly made a false request for an ambulance nor that he knew there was no reasonable ground for believing that assistance was required.  We disagree.  Defendant initially requested transportation so that he could keep an appointment for a sleep study.  Although there is no evidence that that was a false request, *i.e.* that he did not actually have that appointment, the jury could reasonably conclude that once defendant reported chest pain, the request became a false one.  Defendant reported chest pain only after the 911 operator explained that she could not arrange for his transportation to the hospital for a sleep study.  It is reasonable to infer that, if defendant was actually experiencing chest pain, that would have been the first thing he would have mentioned to the 911 operator.  Indeed, defendant testified that he called 911 because of chest pain and shortness of breath.  Although defendant testified that he mentioned the sleep study first because he was trying to give the 911 operator the background of the call, the jury was not required to believe his explanation.

¶ 15    Moreover, although defendant testified that he had been experiencing chest pain for much of the day, McClane testified that when he arrived at defendant's residence, defendant did not appear to be in distress, and he indicated that there was no emergency.  It is possible that defendant's chest pain resolved itself in the interval of roughly seven minutes between the 911 call and the paramedic's arrival at the scene (perhaps, as defendant argues, because the imminent arrival of the ambulance to take him to his sleep study appointment eased his anxiety).  On the other hand, another entirely reasonable inference is that defendant falsely reported chest pain to the 911 operator to convince her that he needed an ambulance, and then abandoned the ruse when the ambulance arrived.

¶ 16    A conviction of disorderly conduct requires proof not only of a false request, but also that the request was made with knowledge that there was "no reasonable ground for believing that the assistance [was] required." 720 ILCS 5/26-1(a)(9) (West 2014). Obviously, defendant would have known that feigned chest pain was not grounds for believing assistance was required. However, defendant also contends that the State failed to prove that defendant knew that it was unreasonable to request assistance so that he could keep his sleep study appointment. We disagree. At no time did defendant give the 911 operator or the emergency personnel any indication that there was an immediate or urgent need for the sleep study. Rather, defendant indicated that he believed that, as a taxpayer, he was entitled to request an ambulance for nonemergency transportation.

¶ 17    Defendant also contends that pursuant to the plain language of section 26-1(a)(9), so long as he reasonably believed he needed *any* type of assistance—whether for an emergency or not— he did not commit a crime. This argument is without merit. Section 26-1(a)(9) requires the State to prove that defendant knew that there was no reasonable ground believing that "the assistance" is required. Defendant observes that the statute "says nothing about *emergency* assistance." (Emphasis in original.) However, in section 26-1(a)(9), the definite article "the" appears before the word "assistance," indicating that there must be a need for a particular kind of assistance. " 'The' is a restrictive term; it indicates that 'a following noun or noun equivalent refers to someone or something previously mentioned or clearly understood from the context or the situation.' " *Sibenaller v. Milschewski*, 379 Ill. App. 3d 717, 722 (2008)) (quoting Webster's Third New International Dictionary 2368 (1986).) A false report to 911 of a medical emergency (such as chest pain) can be expected to trigger the dispatch of "emergency medical technician-ambulance

or emergency medical technician-paramedic." In that setting, "the assistance" requested is emergency assistance.[1]

¶ 18    Defendant also argues that the 911 operator was combative and that "everything [defendant] said after 'sleep study' fell on deaf ears." We fail to see how that has any bearing on the questions for the jury: whether defendant made a false request for emergency assistance and knew that there was no reasonable ground for believing the assistance was necessary. According to defendant, "[i]t is *** reasonable to infer that the 911 operator's argumentative response to his request triggered or amplified his symptoms, such as chest pains and anxiety." However, it was the jury's function, as the trier of fact, to determine what inferences to draw from the evidence.

¶ 19    Defendant further argues he had reasonable grounds to believe that assistance was required based on his medical and psychological history. The argument is unpersuasive. Other than chest pains and anxiety, defendant did not mention that he was experiencing any acute symptoms requiring immediate medical attention. We therefore conclude that the evidence was sufficient to sustain defendant's conviction.

¶ 20    We stress that defendant's crime was not merely that he made an unreasonable request for an ambulance. Members of the general public cannot be expected to know whether a particular medical problem requires an emergency response. When in doubt, they should be encouraged to report a medical problem to a 911 operator—who can gauge the urgency of the problem—without fear of prosecution. However, that rationale does not apply in a case where the caller knowingly reports false information to the 911 operator. Because the evidence was sufficient to enable the

_____

[1] We express no opinion whether, or under what circumstances, a request to a privately owned and operated ambulance service constitutes a request for emergency assistance.

jury to find beyond a reasonable doubt that defendant reported a false symptom—chest pain—to the 911 operator, the State met its burden of proof.

¶ 21                                    III. CONCLUSION

¶ 22     For the foregoing reasons, we affirm the judgment of the circuit court of De Kalb County.

¶ 23     Affirmed.