2019 IL App (2d) 190228-U
No. 2-19-0228
Order filed December 18, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CM-362 |
| KEVIN S. CONVERSE, | ) ) | Honorable John J. Scully, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The State proved defendant guilty beyond a reasonable doubt of disorderly conduct, as the trial court could infer that the victim felt threatened by defendant's conduct, it could credit her out-of-court identification of defendant despite her inability to make an in-court identification, and it could rely on its in-court observations of defendant to find that a video depicted him.

¶ 2    Defendant, Kevin S. Converse, appeals from his conviction of disorderly conduct (720 ILCS 5/26-1(a)(1) (West 2016)), arguing that the evidence was insufficient to prove him guilty beyond a reasonable doubt and that the trial court, in assessing the credibility of an eyewitness, improperly relied on matters outside the record.  We affirm.

¶ 3                                   I. BACKGROUND

¶ 4       On February 3, 2016, defendant was charged, in count I, with public indecency (*id.* § 11-30(a)(1)) and, in count II, with disorderly conduct (*id.* § 26-1(a)(1)), stemming from his entry, on November 28, 2015, into a store with his penis exposed.  On July 21, 2016, a third count, alleging public indecency based on an intent to arouse (*id.* § 11-30(a)(2)), was added.  Ultimately count I was dismissed, and the matter proceeded to a bench trial on counts II and III.

¶ 5       Defendant's bench trial took place on January 15, 2019.  The following relevant testimony was presented.  Sandra Fernandez testified that, on November 28, 2015, at about 8:18 a.m., she was working as a manager at Family Dollar in Gurnee when a man walked into the store with his penis exposed.  When asked whether she saw that man in court, she replied, "I have to be honest, it's been so long and I can't—I can't tell you."  Fernandez testified that she immediately told the man to leave and called the police.  She walked outside and saw the man enter a car and drive away.  She testified that she could see the car "[v]ery clearly" and could also see into the car.  She did not see anyone else in the car.  She obtained the car's license plate number and gave it to the police.  When asked how she felt when the man exposed himself to her, she stated:

> "Violated.  I have never had anybody do that to me before.  For the life of me, I couldn't figure out why.  It was just a very bad feeling.  I was disgusted.  I was hurt.  I was very upset.  I don't know what his intentions were.  I don't—I just—not a good feeling at all."

¶ 6       Fernandez further testified that Family Dollar had a surveillance system that was working on the day of the incident.  The State marked People's exhibit No. 1 as a copy of the surveillance video of the incident.  Defendant objected to the admission of the video.  (The trial court allowed Fernandez to testify as to the video but withheld its admission into evidence pending further testimony from another witness.)  Fernandez testified that she turned the video over to a Gurnee

police officer after watching the footage with the officer. The video was played in court, beginning with the time-stamp of about 9:14 a.m., and Fernandez confirmed that it was the same video that she had watched with the officer. Fernandez testified that the man who had exposed himself to her had entered the store twice. The first time he entered, he asked her where the food and snacks were, telling her that he had been drinking the night before. When the man entered the store a second time, his penis was out. Fernandez can be seen on the video walking outside the store while holding a phone. She testified that she was on the phone with the police and gave them the license plate number. The State played a second video, showing the same incident from a different camera angle. (Again, the court allowed the video to be shown but withheld its admission into evidence.) Fernandez testified that the video showed the same man exposing his penis. When asked whether she saw the man depicted in the video in court, she responded, "Being completely honest, I cannot tell just because this man was not—this man was bald, he had glasses on, and it was over two years ago. So it is very hard for me to tell."

¶ 7    Fernandez testified further that, during the investigation, she took part in an "e-lineup." She explained that she viewed pictures on a laptop. The laptop had a camera that recorded her while she viewed the pictures. She identified defendant as the person who had exposed himself to her. When asked what it was about defendant that made her pick him, she stated, "It was still fresh in my mind. I was still—I guess you can say traumatized by it. I had no doubt, no doubt." She continued, "His mouth, I think, was very—just this part was—very—how do you say it? Unique I guess you could say. Yeah, I could just—I knew it was him. I had no doubt in my mind whatsoever. But, again, this was when it had just happened." Fernandez could not provide an exact date of when the lineup occurred. She testified that it was "maybe a few weeks, maybe a month," after the incident.

¶ 8    On cross-examination, Fernandez testified that she had last seen the surveillance video on the day of the incident.  She could not remember what time she called the police, but she stated that, based on the video, it was probably "9:15-ish."  She testified that, the first time the man entered the store, he was present for a "minute or two."  He was wearing sunglasses and she could not see his eyes.  When he returned the second time, with his penis exposed, she saw him for only a "couple seconds."  She testified that she looked right at him and told him to leave the store.  Defendant entered Defense exhibit No. 1, an audio recording of Fernandez's call to 911, into evidence.  Fernandez agreed that she stated that she thought the license plate was from Illinois but later learned that it was from Wisconsin.  Defendant entered Defense exhibit No. 2, the audio and video recording of the e-lineup, and Defense exhibit No. 3, the audio recording of the e-lineup, into evidence.  Fernandez agreed that, during the e-lineup, she stated, " 'It's got to be No. 2.' "  She testified that at the time of the lineup she was not sure whether the man who had exposed himself was included in the lineup.  She looked at all of the pictures multiple times.

¶ 9    On redirect examination, Fernandez testified that she was not instructed that she had to pick someone from the lineup and she knew that she did not have to pick anyone.  When asked why she identified defendant, she responded: "Because that's exactly who I saw."

¶ 10    Village of Gurnee police officer Kirk Helgesen testified that he received a call concerning the incident and went to Family Dollar to investigate.  He spoke with Fernandez and was given access to the store's surveillance video.  He viewed the interaction between defendant and Fernandez from two different camera angles—one of the surveillance cameras was pointed at the cashier area and the other was pointed at the entrance of the store.  Helgesen was shown both videos and identified them as the videos that he watched with Fernandez at the store.  He testified that the videos were in the same condition that they were in on the day that he watched them with

Fernandez. Helgesen could not recall the exact date that the videos were entered into the evidence storage facility. The videos were allowed into evidence over defendant's objection. Helgesen could not explain why his police report gave the time of the incident as 8:18 a.m. when the video camera showed a time of about an hour later.

¶ 11 Helgesen further testified that the license plate number provided by Fernandez was registered to defendant. Helgesen never had any contact with defendant. An "e-lineup program" was used to assist in identifying the suspect. Helgesen obtained an old booking photo of defendant and then chose five similar individuals to create a lineup. Another officer conducted the e-lineup with Fernandez.

¶ 12 On cross-examination, Helgesen testified that the photo he selected of defendant for the e-lineup was 15 years old. It was the only photo that he had available. The birth years for the other individuals used in the lineup were 1963, 1952, 1961, 1957, and 1961. Helgesen agreed that, although defendant was born in 1962, the picture he used of defendant showed him at 16 years younger than the other individuals used. Helgesen identified Defense exhibit No. 6 as a police incident report showing that the 911 call regarding the incident was received at 8:17 a.m. and that the suspect's vehicle had a Wisconsin license plate.

¶ 13 On redirect examination, Helgesen testified that the "LEADS database" in his squad car will detect in-state and out-of-state vehicles. When he entered the license plate number in to the database, it showed that it was registered to defendant in Wisconsin.

¶ 14 Village of Gurnee police officer Kelly Hansen testified that, on November 30, 2018, she conducted the e-lineup for Fernandez. At the time, she had no independent knowledge of the case nor did she know who the suspect was. Hansen testified that she explained the e-lineup process to Fernandez. She told her that the suspect might or might not be in the lineup, that she could go

back through and review the pictures after an initial viewing, and that she should take her time. Hansen testified that the e-lineup program provided similar instructions. Hansen testified that she left the room while Fernandez viewed the pictures. The e-lineup program made a video and audio recording of Fernandez as she used the program. Fernandez selected defendant from the lineup. People's exhibit No. 2, the photograph of defendant included in the e-lineup, and People's exhibit No. 3, the six photographs included in the e-lineup, were identified by Helgesen and admitted into evidence.

¶ 15 At the close of the State's case, defendant moved for a directed finding, arguing that the State failed to present evidence that defendant was the man who exposed himself in the store, given that Fernandez could not make an in-court identification. The State responded that an in-court identification was not required and that Fernandez positively identified defendant through his photo in the e-lineup. The State also noted that defendant had changed his appearance by coloring his hair and growing a beard.

¶ 16 The trial court denied the motion with respect to the charge of disorderly conduct. The court specifically noted that, as the case proceeded, the court had observed defendant. When defendant was on "active duty," his hair was short. The court observed that defendant now "has got a beard that's substantial, and his hair is different." The court concluded that the fact that Fernandez could not identify defendant in court "means nothing ***. The out of court is sufficient at least to proceed further." The court granted the motion with respect to the charge of public indecency, finding that the State failed to put forth evidence of defendant's intent to arouse.

¶ 17 Defendant testified that he was 56 years old and worked as a mechanic for American Airlines. On the evening before the incident, defendant was at "Port O' Call Sam Adams Brew" at the Great Lakes Naval Base. He was with "Frank Zeissler" and "Tom Moraitis," who were

"there for their kids' graduation." One of the men was in the Army and the other in the Marines. Defendant did not know either of the men prior to that evening. When the bar closed, sometime after midnight, they drove to a "local bar" to play pool. It was off base and not near Gurnee. Frank drove defendant's car, Tom sat in the passenger seat, and defendant sat in the back seat. Defendant did not want to drive, because he had been drinking. The three men left the second bar at about 2 a.m. They did not want to return to the base, because they had had too much to drink. Frank drove the men to a mall parking lot where they rested in the car. When they woke up, Frank wanted to get something to eat, so Frank drove the men to the Family Dollar store in Gurnee. Frank went into the store. When Frank returned, he did not say anything about what happened in the store. When Frank drove away, defendant was lying down in the back seat. Tom was in the passenger seat, with the seat reclined. They returned to the naval base and defendant never saw Frank or Tom again. Seven months later, defendant was in a car accident. When the police arrived to investigate the accident, defendant learned that there was a warrant out for his arrest. He was taken to the Rosemont police station and he posted bond. He was never questioned about the incident at Family Dollar.

¶ 18    In finding defendant guilty, the court stated as follows:

"Well, Count 2 requires causing a disturbance in such—in a reasonable [*sic*] manner as to alarm and disturb Sandra Fernandez. She was alarmed and disturbed; she said that. And provoke a breach of the peace. She has never had anything like this happen to her, and she was upset, upset enough for her to demand the person to leave and for her right away to call the police.

Now, the person that came in·was walking in the store while she was working; that's proven. Was his penis hanging out of his pants? That's been proven. She testified to it. You could see it on the video that his penis was out. \*\*\*

The question becomes is it this defendant. I'm convinced beyond a reasonable doubt that it was. I have seen him in court several times. I see how he walked. I saw how he walked back and forth, very similar to what we saw in the video. He has changed his appearance, but she has a solid identification. She had a chance to see him two different times in the store and then going out and watching him and seeing it was his car and saw that there was nobody inside the car besides the defendant. Defendant says, his car was there. I do not believe his testimony. I believe hers. I think it is good, valid. Is it perfect? No, but it is enough for proof beyond a reasonable doubt that this defendant is the one that came in and exposed his penis to alarm and disturb her \*\*\*."

¶ 19    On February 14, 2019, defendant filed a posttrial motion, asking the trial court to reconsider its finding of guilt. Defendant argued that the evidence was insufficient. As part of the argument, defendant asserted that the surveillance video "was admitted into evidence and consideration without the proper foundation or exhibition of proper chain of custody." Defendant also argued that the trial court improperly relied on matters outside of the record.

¶ 20    At the outset of the hearing, defense counsel stated: "[A]fter doing a little bit of research, the issue about the foundation for the video, I don't want to withdraw it, but I understand now, but the case law that's it's visceral [*sic*]. We videotape everything these days so the chain of custody and all is such a issue that it use to be [*sic*]. I'm not going·to focus on that, but I would focus on the evidence the court did hear."

¶ 21    After hearing argument, the trial court denied the motion. The court stated:

"[I]t was clear she spent a lot of time reviewing the video lineup, not the video of the incident, but the pictures that they·had, and it's clear to me that she was convinced that the picture she selected was the person who was there.

And, in fact, your client put himself in the location, not inside, but put himself in the vehicle. His story was not believable, hers was. I believe that was valid identification.

I mainly made my decision based upon one, her identification, which I believe is valid and that the defendant himself put himself there and told his story that was not believable that they went, he and some others, who we can't really find, which is not up to him, but the Port Of Call, which is at Great Lakes which is down in North Chicago, that they then went somewhere else and they came to one spot in a Dollar Store in Gurnee to get something to eat but it wasn't him.

I don't believe his testimony. I believe hers, and I believe all in all that it was proof beyond a reasonable doubt so I'm denying your motion."

¶ 22 Following a sentencing hearing, the trial court sentenced defendant to one year of court supervision. Defendant timely appealed.

¶ 23                                    II. ANALYSIS

¶ 24 Defendant argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt of disorderly conduct. More specifically, defendant contends that the State failed to prove that his conduct caused a breach of the peace and that he was the person who committed the offense. In addition, defendant argues that the trial court, in finding credible Fernandez's identification testimony, improperly relied on matters outside the record.

¶ 25 A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v.*

*Collins*, 106 Ill. 2d 237, 261 (1985). When we review a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and determining what inferences to draw, and a reviewing court ordinarily will not substitute its judgment on these matters for that of the trier of fact. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000).

¶ 26    To prove defendant guilty of disorderly conduct, the State had to prove that he knowingly did any act in such an unreasonable manner as to alarm or disturb another and to provoke a breach of the peace. 720 ILCS 5/26-1(a)(1) (West 2016). Therefore, the State had to prove that defendant knowingly engaged in conduct that (1) was unreasonable, (2) alarmed or disturbed another, and (3) provoked a breach of the peace. *Id.* Here, defendant argues first that the State failed to prove that he provoked a breach of the peace.

¶ 27    According to defendant, Fernandez's testimony did not establish a breach of the peace beyond a reasonable doubt because "[s]he did not testify that she felt threatened by the offender's behavior and immediately told him to leave the store and then followed the offender out of the store." We disagree. As this court has noted,

> "[d]isorderly conduct is loosely defined. The main purpose of the statute is to guard against
> an invasion of the right of others not to be molested or harassed, either mentally or
> physically, without justification. [Citation.] As a highly fact-specific inquiry, it embraces
> a wide variety of conduct serving to destroy or menace the public order and tranquility.

[Citation.]"  (Internal quotation marks omitted.)  *People v. Steger*, 2018 IL App (2d) 151197, ¶ 30.

A breach of the peace can occur without overt threats.  *Id.*  Surrounding circumstances are relevant in determining whether a defendant's conduct breached the peace.  *People v. Pence*, 2018 IL App (2d) 151102, ¶ 17; *Steger*, 2018 IL App (2d 151197, ¶ 33.

¶ 28    Here, Fernandez was alone in the store when the offender walked in with his penis exposed. She demanded that he leave the store and she immediately called 911.  When asked how the offender's actions made her feel, she stated:

> "Violated.  I have never had anybody do that to me before.  For the life of me, I couldn't figure out why.  It was just a very bad feeling.  I was disgusted.  I was hurt.  I was very upset.  I don't know what his intentions were.  I don't—I just—not a good feeling at all."

When testifying to her identification of defendant, she further stated that she had been "traumatized" by the event.  Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found that Fernandez, a woman alone in a store, when confronted by a man with his penis exposed, not knowing what his intentions were, felt threatened by defendant's conduct.  To be sure, she followed him out of the store, but only after she had the police on the phone and saw that he was heading toward his vehicle.  Accordingly, we find that the evidence was sufficient to prove that defendant's conduct provoked a breach of the peace.

¶ 29    Defendant also argues that Fernandez's identification of defendant was insufficient to support the conviction, because it "was not positive and credible."  We disagree.  Fernandez testified that, at the time of the lineup, "It was still fresh in my mind.  I was still—I guess you can say traumatized by it.  I had no doubt, no doubt."  She continued, "His mouth, I think, was very— just this part was—very—how do you say it?  Unique I guess you could say.  Yeah, I could just—

I knew it was him. I had no doubt in my mind whatsoever. But, again, this was when it had just happened." She testified that she was not instructed that she had to pick someone from the lineup and she knew that she did not have to pick anyone. When asked why she identified defendant, she responded: "Because that's exactly who I saw." Although Fernandez was unable to identify defendant in open court, the trial court explained that defendant's appearance had changed since the time of the crime. In any event, Fernandez's testimony regarding her identification of defendant during the e-lineup was clear—she had no doubt. Accordingly, the trial court's findings regarding her credibility and her testimony supporting a conviction were not against the manifest weight of the evidence. See *People v. Gonzalez*, 292 Ill. App. 3d 280, 288-89 (1997) (holding that, despite the eyewitness's inability to identify the defendant in open court, the eyewitness's prior identification of the defendant was sufficient to sustain the defendant's residential burglary conviction).

¶ 30    Defendant also argues that the trial court improperly assessed Fernandez's credibility by considering matters outside the record, more specifically, the court's own observations of defendant and its determination that defendant was the person in the surveillance video. We disagree. First, we note that the cases relied on by defendant to support this argument are readily distinguishable. In each case, the trial court improperly relied on out-of-court knowledge. See *People v. Dameron*, 196 Ill. 2d 156, 172-79 (2001) (trial judge violated due process by giving weight to a social science book and a death penalty case over which his father had presided); *People v. Steidl*, 177 Ill. 2d 239, 266 (1997) (trial court improperly relied on its knowledge of counsel's performance in other cases to evaluate the defendant's claims of ineffective assistance of counsel); *People v. Wallenberg*, 24 Ill. 2d 350, 353-54 (1962) (trial court improperly relied on its personal knowledge on the availability of gas stations along the route traveled by the defendant

to find the defendant's testimony incredible).  Here, the trial court relied on in-court observations of the defendant.  It is within the province of the trier of fact—here, the trial court—to reach its own conclusion regarding who is depicted in a surveillance video.  See *People v. Thompson*, 2016 IL 118667, ¶ 54.  Thus, we find no error.

¶ 31    Finally, we note that defendant also contends that the surveillance video was admitted into evidence "without the proper foundation or exhibition of proper chain of custody."  Defendant makes this bare assertion without any citation to the record or to authority.  In addition, defendant does not advance any argument in support of this claim.  Thus, we find the issue forfeited.  See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (points not argued are forfeited); *People v. Ward*, 215 Ill. 2d 317, 332 (2005) (points raised in a brief but not supported by citation to relevant authority are forfeited).

¶ 32                                III. CONCLUSION

¶ 33    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 34    Affirmed.